JS 44 (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

ALAMEDA COUNTY, CALIFORNIA, a Municipal Corporation, on behalf of itself and all others similarly situated

## DEFENDANTS

SEE ATTACHMENT

**(b)** County of Residence of First Listed Plaintiff **Alameda County**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Eric B. Fastiff (State Bar No. 182260)
Lieff, Cabraser, Heimann & Bernstein, LLP
275 Battery St., 30th Floor
San Francisco, CA 94111
Tel: (415) 956-1000

Attorneys (If Known)

08-3278
EDL.

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question (U.S. Government Not a Party)
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                         and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury— | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal | [X] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product | Med. Malpractice | [ ] 625 Drug Related Seizure | 28 USC 157 | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | Liability | [ ] 365 Personal Injury — | of Property 21 USC 881 | | [ ] 450 Commerce |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & | Product Liability | [ ] 630 Liquor Laws | **PROPERTY RIGHTS** | [ ] 460 Deportation |
| & Enforcement of Judgment | Slander | [ ] 368 Asbestos Personal | [ ] 640 R.R. & Truck | [ ] 820 Copyrights | [ ] 470 Racketeer Influenced and |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' | Injury Product | [ ] 650 Airline Regs. | [ ] 830 Patent | Corrupt Organizations |
| [ ] 152 Recovery of Defaulted | Liability | Liability | [ ] 660 Occupational | [ ] 840 Trademark | [ ] 480 Consumer Credit |
| Student Loans | [ ] 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | [ ] 490 Cable/Sat TV |
| (Excl. Veterans) | [ ] 345 Marine Product | [ ] 370 Other Fraud | [ ] 690 Other | | [ ] 810 Selective Service |
| [ ] 153 Recovery of Overpayment | Liability | [ ] 371 Truth in Lending | | | [ ] 850 Securities/Commodities/ |
| of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | Exchange |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle | Property Damage | [ ] 710 Fair Labor Standards | [ ] 861 HIA (1395ff) | [ ] 875 Customer Challenge |
| [ ] 190 Other Contract | Product Liability | [ ] 385 Property Damage | Act | [ ] 862 Black Lung (923) | 12 USC 3410 |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal Injury | Product Liability | [ ] 720 Labor/Mgmt. Relations | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| [ ] 196 Franchise | | | [ ] 730 Labor/Mgmt.Reporting | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| | | **PRISONER** | & Disclosure Act | [ ] 865 RSI (405(g)) | [ ] 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PETITIONS** | [ ] 740 Railway Labor Act | | [ ] 893 Environmental Matters |
| | | | [ ] 790 Other Labor Litigation | | [ ] 894 Energy Allocation Act |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motions to Vacate | [ ] 791 Empl. Ret. Inc. | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information |
| [ ] 220 Foreclosure | [ ] 442 Employment | Sentence | Security Act | | Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ | **Habeas Corpus:** | | [ ] 870 Taxes (U.S. Plaintiff | [ ] 900 Appeal of Fee |
| [ ] 240 Torts to Land | Accommodations | [ ] 530 General | | or Defendant) | Determination |
| [ ] 245 Tort Product Liability | [ ] 444 Welfare | [ ] 535 Death Penalty | | [ ] 871 IRS—Third Party | Under Equal Access |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities - | [ ] 540 Mandamus & Other | **IMMIGRATION** | 26 USC 7609 | to Justice |
| | Employment | [ ] 550 Civil Rights | [ ] 462 Naturalization Application | | [ ] 950 Constitutionality of |
| | [ ] 446 Amer. w/Disabilities - | [ ] 555 Prison Condition | [ ] 463 Habeas Corpus – | | State Statutes |
| | Other | | Alien Detainee | | |
| | [ ] 440 Other Civil Rights | | [ ] 465 Other Immigration | | |
| | | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing **(Do not cite jurisdictional statutes unless diversity):**
15 U.S.C. Section 1

Brief description of cause:
Unlawfully rigging bids for municipal bond guaranteed investment contracts and other reinvestments

## VII. REQUESTED IN COMPLAINT:

[X] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE". MDL No. 1950

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)

[X] SAN FRANCISCO/OAKLAND    [ ] SAN JOSE

DATE
July 7, 2008

SIGNATURE OF ATTORNEY OF RECORD
Eric B. Fastiff

759620.1

## ATTACHMENT TO
## CIVIL COVER SHEET

**I. (a)**

ALAMEDA COUNTY, CALIFORNIA, a Municipal Corporation, on behalf of itself and
all others similarly situated,

        Plaintiff,

v.

AIG FINANCIAL PRODUCTS CORP.; AIG SUNAMERICA LIFE ASSURANCE CO.;
BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; BEAR
STEARNS COMPANIES, INC.; CAIN BROTHERS & COMPANY, LLC; CDR
FINANCIAL PRODUCTS, INC.; FINANCIAL GUARANTY INSURANCE CO.;
FINANCIAL SECURITY ASSURANCE HOLDINGS, LTD.; FIRST SOUTHWEST
COMPANY; GE FUNDING CAPITAL MARKET SERVICES, INC.; GENWORTH
FINANCIAL, INC.; GENWORTH FINANCIAL INVESTMENT MANAGEMENT,
LLC.; GEORGE K. BAUM & COMPANY; INVESTMENT MANAGEMENT
ADVISORY GROUP, INC.; JPMORGAN CHASE & CO.; JPMORGAN CHASE
BANK, N.A.; KINSELL NEWCOMB & DE DIOS, INC.; LEHMAN BROTHERS INC.;
MERRILL LYNCH & CO. INC.; MORGAN KEEGAN & CO., INC.; MORGAN
STANLEY; NATIONAL WESTMINSTER BANK plc; NATIXIS, S.A.; PACKERKISS
SECURITIES, INC.; PIPER JAFFRAY & CO.; SECURITY CAPITAL ASSURANCE,
INC.; SHOCKLEY FINANCIAL CORP.; SOCIÉTÉ GÉNÉRALE; SOUND CAPITAL
MANAGEMENT, INC.; TRINITY FUNDING COMPANY, LLC; UBS AG; UBS
SECURITIES LLC; UBS FINANCIAL SERVICES, INC.; WACHOVIA BANK, N.A.;
WACHOVIA CORPORATION; WINTERS & CO. ADVISORS, LLC; XL ASSET
FUNDING COMPANY 1 LLC; XL CAPITAL, LTD.; and XL LIFE INSURANCE &
ANNUITY COMPANY,

        Defendants.

**I. (c)**

Richard M. Heimann (State Bar No. 63607)
rheimann@lchb.com
Joseph R. Saveri (State Bar No. 130064)
jsaveri@lchb.com
Eric B. Fastiff (State Bar No. 182260)
efastiff@lchb.com
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111

Steven E. Fineman (State Bar No. 140335)
sfineman@lchb.com
Daniel E. Seltz
dseltz@lchb.com
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
780 Third Avenue, 48th Floor
New York, NY 10017

770984.1
DRAFT 7/7/08 10:23 AM

James A. Quadra (State Bar No. 131084)
Sylvia Sokol (State Bar No. 200126)
MOSCONE, EMBLIDGE & QUADRA, LLP
220 Montgomery Street
Mills Tower, Suite 2100
San Francisco, CA 94104
Telephone:     (415) 362-3599
Facsimile:     (415) 362-2006

ORIGINAL

1   Richard E. Winnie, County Counsel (SBN 68048)
    richard.winnie @acgov.org
2   Brian E. Washington, Assistant County Counsel (SBN 146807)
    brian.washington@acgov.org
3   Claude F. Kolm, Deputy County Counsel (SBN 83517)
    claude.kolm@acgov.org
4   COUNTY OF ALAMEDA, CALIFORNIA
    1221 Oak Street, Suite 463
5   Oakland, CA 94612
    Telephone:   (510) 272-6700
6   Facsimile:   (510) 272-5020

7   Richard M. Heimann (SBN 63607)
    rheimann@lchb.com
8   Joseph R. Saveri (SBN 130064)
    jsaveri@lchb.com
9   Eric B. Fastiff (SBN 182260)
    efastiff@lchb.com
10  Jordan Elias (SBN 228731)
    jelias@lchb.com
11  LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 30th Floor
12  San Francisco, California 94111
    Telephone:   (415) 956-1000
13  Facsimile:   (415) 956-1008

14  James A. Quadra (SBN 131084)
    quadra@meqlaw.com
15  Sylvia Sokol (SBN 200126)
    sokol@meqlaw.com
16  MOSCONE, EMBLIDGE & QUADRA, LLP
    220 Montgomery Street
17  Mills Tower, Suite 2100
    San Francisco, California 94104
18  Telephone:   (415) 362-3599
    Facsimile:   (415) 362-2006
19
    Attorneys for Individual and Representative Plaintiff
20  County of Alameda, California

21              UNITED STATES DISTRICT COURT

22              NORTHERN DISTRICT OF CALIFORNIA

23  COUNTY OF ALAMEDA, CALIFORNIA, a          Case No.          EDL 3278
    Municipal Corporation, on behalf of itself and all
24  others similarly situated,                   COMPLAINT FOR VIOLATIONS
                                                 OF THE SHERMAN ACT, THE
25                 Plaintiff,                     CARTWRIGHT ACT,
                                                 AND THE UNFAIR
26          v.                                   COMPETITION LAW

27  AIG FINANCIAL PRODUCTS CORP.; AIG           CLASS ACTION
    SUNAMERICA LIFE ASSURANCE CO.; BANK         JURY TRIAL DEMANDED
28  (caption continued on next page)

763663.1                                         CLASS ACTION COMPLAINT

1 | OF AMERICA CORPORATION; BANK OF
AMERICA, N.A.; BEAR STEARNS
2 | COMPANIES, INC.; CAIN BROTHERS &
COMPANY, LLC; CDR FINANCIAL
3 | PRODUCTS, INC.; FINANCIAL GUARANTY
INSURANCE CO.; FINANCIAL SECURITY
4 | ASSURANCE HOLDINGS, LTD.; FIRST
SOUTHWEST COMPANY; GE FUNDING
5 | CAPITAL MARKET SERVICES, INC.;
GENWORTH FINANCIAL, INC.; GENWORTH
6 | FINANCIAL INVESTMENT MANAGEMENT,
LLC; GEORGE K. BAUM & COMPANY;
7 | INVESTMENT MANAGEMENT ADVISORY
GROUP, INC.; JPMORGAN CHASE & CO.;
8 | JPMORGAN CHASE BANK, N.A.; KINSELL
NEWCOMB & DE DIOS, INC.; LEHMAN
9 | BROTHERS INC.; MERRILL LYNCH & CO.
INC.; MORGAN KEEGAN & CO., INC.;
10 | MORGAN STANLEY; NATIONAL
WESTMINSTER BANK plc; NATIXIS, S.A.;
11 | PACKERKISS SECURITIES, INC.; PIPER
JAFFRAY & CO.; SECURITY CAPITAL
12 | ASSURANCE, INC.; SHOCKLEY FINANCIAL
CORP.; SOCIÉTÉ GÉNÉRALE; SOUND
13 | CAPITAL MANAGEMENT, INC.; TRINITY
FUNDING COMPANY, LLC; UBS AG; UBS
14 | SECURITIES LLC; UBS FINANCIAL SERVICES
INC.; WACHOVIA BANK, N.A.; WACHOVIA
15 | CORPORATION; WINTERS & CO. ADVISORS,
LLC; XL ASSET FUNDING COMPANY I LLC;
16 | XL CAPITAL, LTD.; and XL LIFE
INSURANCE & ANNUITY COMPANY,

17

Defendants.

18

19

20 Plaintiff County of Alameda, California (hereafter "Alameda County" or

21 "Plaintiff"), individually and on behalf of a class of all those similarly situated, brings this action

22 for treble damages under the antitrust laws of the United States against Defendants, demands a

23 trial by jury, and alleges the following on information and belief except as to the contents of

24 Paragraphs 1 and 16 which are based on personal knowledge:

25 ## NATURE OF THE CASE

26 1. Alameda County, California has issued hundreds of millions of dollars of

27 tax-free bonds since 1992 and has purchased Guaranteed Investment Contracts ("GICs"), swaps,

28 and forward sale, forward delivery, and float forward agreements to allow Alameda County to

763663.1                              - 1 -                    CLASS ACTION COMPLAINT

1   have funds available while earning either a higher rate of return than they would if it had simply

2   invested the proceeds in a savings account or a hedge against variable interest rates. For example,

3   Alameda County and its constituent agencies, such as the Alameda County Joint Powers

4   Authority and the Alameda County Redevelopment Agency, issued tax-free municipal bonds,

5   *inter alia*, to finance construction of a new juvenile justice facility, provide for redevelopment

6   projects, and to reconstruct the Oakland-Alameda County Coliseum.

7       2.      Alameda County alleges a nationwide conspiracy among Defendants to rig

8   bids, to allocate customers and markets, and to fix, raise, maintain, or stabilize the returns

9   received by Alameda County and the members of the Class for Municipal Derivatives (as defined

10  below), including but not limited to GICs and swaps, sold in the United States.

11      3.      Alameda County brings this action on behalf of itself and all entities that

12  contracted for Municipal Derivatives in the United States and its territories directly from

13  Municipal Derivatives Seller Defendants and Municipal Derivatives Broker Defendants, as

14  defined in this Complaint during the period from January 1, 1992 through December 31, 2007.

15  As a result of Defendants' unlawful conduct, Alameda County and the Class, as defined in this

16  Complaint, have paid supracompetitive prices for these products, and therefore suffered injury to

17  their business and property.

18                          **JURISDICTION AND VENUE**

19      4.      Alameda County brings this action pursuant to Section 4 of the Clayton

20  Act, 15 U.S.C. §§ 15, for treble damages, as well as reasonable attorneys' fees and costs of suit,

21  for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, the Cartwright Act,

22  California Business and Professions Code § 16720, *et seq.*, and the California Unfair Competition

23  Law, Business and Professions Code § 17200, *et seq.*

24      5.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1337, and

25  1367 and by Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

26      6.      Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15(a) and

27  22 and 28 U.S.C. § 1391(b), (c), and (d) because during the Class Period, one or more of the

28  Defendants resided, transacted business, was found, or had agents in this district, and because a

763663.1                       - 2 -                    CLASS ACTION COMPLAINT

1   substantial part of the events giving rise to Alameda County's claims occurred, and a substantial

2   portion of the affected interstate trade and commerce described below was carried out in this

3   district.

4                              **INTRA-DISTRICT ASSIGNMENT**

5          7.     Pursuant to Local Rules 3-5(b) and 3-2(c), this action should be assigned to

6   the San Francisco/Oakland Division based on Alameda County's location.

7                                   **DEFINITIONS**

8          8.     Bid:  As used herein, the term "Bid" means the Rate of Return offered by

9   prospective Municipal Derivatives Sellers during the Competitive Bidding Process for GICs or

10   the competitive processes by which other Municipal Derivatives are purchased by Government

11   Entities.

12         9.     Competitive Bidding Process:  As used herein, the term "Competitive

13   Bidding Process" means the process mandated by Treasury Regulation §148.5, *et seq.*, and

14   detailed below in Paragraphs 74 through 92, by which at least three Municipal Derivatives Sellers

15   submit Bids to the Municipal Derivatives Broker retained by the Government Entity seeking to

16   purchase a Guaranteed Investment Contract, as that term is defined herein.

17        10.    Government Entity:  As used herein, the term "Government Entity" means

18   any state, local or municipal body or any subdivision thereof.  Excluded from the definition of

19   Government Entity is any federal government body.

20        11.    Municipal Derivative:  As used herein, the term "Municipal Derivative"

21   means a variety of financial instruments that Government Entities use to invest the proceeds of

22   bond offerings while waiting to use bond proceeds for their purposes or to hedge and shift the

23   interest-rate risk associated with the issuance of tax-exempt debt.  As used herein, the term

24   Municipal Derivative encompasses all of the following types of transactions:

25             a.     Guaranteed Investment Contract ("GIC"):  "Guaranteed Investment

26   Contract" or "GIC" is a security in which a Government Entity contracts with a Municipal

27   Derivative Counterparty, typically an investment bank or bond insurer with an AAA or AA credit

28   rating, to invest the proceeds of a municipal bond offering for a fixed amount of time in exchange

763663.1                      - 3 -                   CLASS ACTION COMPLAINT

1  for a series of payments at a guaranteed Rate of Return over the life of the contract. A GIC is a

2  Municipal Derivative, and are sometimes characterized as "forward purchase," "forward delivery

3  or "repurchase" agreements (typically used for debt service funds), or as "unsecured" GICs

4  (typically used for capital projects and subject to provisions allowing investment principal to be

5  drawn down pursuant to a set schedule). A GIC is similar to a bond, in that "principal" – the

6  proceeds of a municipal bond issue – is invested in exchange for payment of a certain fixed Rate

7  of Return determined by the terms of the contract.

8       b.  Advance Refunding Escrow: An "advance refunding escrow" is an

9  arrangement by which the proceeds of a refunding issue (a bond issued to refund an outstanding

10  bond) are deposited into an escrow account for investment in an amount sufficient to pay the

11  principal of, and interest on, the underlying issue to be refunded on the original interest payment

12  and maturity dates.

13       c.  Swap: A "swap" is a type of agreement frequently used to

14  minimize the interest rate risk Government Entities face when issuing large amounts of tax-

15  exempt debt obligations. A swap involves two Counterparties – the Government Entity and a

16  Municipal Derivatives Seller – and is essentially the sale of an instrument and the simultaneous

17  purchase of another instrument for purposes of enhancing the Counterparties' respective holdings.

18  Government Entities use swaps to achieve desired tax results, or to alter or protect various

19  features of an existing municipal bond portfolio. There are several types of swaps: (a) floating-

20  for-fixed interest swap; (b) fixed-for-floating interest swap; and (c) floating-for-floating (basis-

21  rate) swap, where the two are based on different indices (typically the LIBOR or BMA indices).

22  Government Entities, even those with sophisticated and experienced municipal finance

23  departments, retain a Municipal Derivatives Broker (including many of those named as

24  Defendants herein) as "swap advisors" to aid in the swap transaction.

25       d.  Option: An "option" is one of two types of agreements used to

26  shift a Government Entity's tax-exempt securities holdings typically acquired in association with

27  issuance of municipal bonds.

28

763663.1             - 4 -            CLASS ACTION COMPLAINT

1          i.    A <u>Put Option</u> is a provision in a bond contract where the

2   investor has the right, on specified dates after required notification, to surrender the securities to

3   the issuer or the issuer's agent at the predetermined price (usually par value).

4          ii.    A <u>Call Option</u> is a transaction where the issuer repays to the

5   holder of an outstanding security the principal amount thereof (plus, in certain cases, an

6   additional amount representing a redemption premium) as a result of the issuer exercising a right

7   under the bond contract to repay the security prior to its scheduled maturity date (often referred to

8   as the "call").

9          e.    <u>Swaption</u>: A "Swaption" is the combination of a Swap and an

10   Option.

11          f.    <u>Interest Rate Floors and Collars</u>: Interest rate "floors" and "collars"

12   are agreements in which a Government Entity agrees with a Municipal Derivatives Seller (the

13   Counterparty) to pay fixed rates of interest on an investment of variable-rate debt, either agreeing

14   to pay the Counterparty an interest rate at or above a specified rate (a "floor") or no more or less

15   than a particular interest rate within range of interest rates (a "collar").

16          g.    <u>Forward Rate Agreements</u>: An over-the-counter contract between

17   parties that determines the rate of interest to be paid or received on an obligation beginning at a

18   future start date. The contract will determine the rates to be used along with the termination date

19   and notional value. On this type of agreement, it is only the differential that is paid on the

20   notional amount of the contract. Typically, for agreements dealing with interest rates, the parties

21   to the contract will exchange a fixed rate for a variable one. The party paying the fixed rate is

22   usually referred to as the borrower, while the party receiving the fixed rate is referred to as the

23   lender.

24          12.    <u>Municipal Derivatives Broker</u>: As used herein, the term "Derivatives

25   Broker" means an entity retained by a Government Entity to oversee the processes, including the

26   Competitive Bidding Process, pursuant to which Municipal Derivatives are purchased.

27   Derivatives Brokers act as fiduciaries of a Government Entity seeking to purchase Municipal

28   Derivatives, often acting as swap advisors in addition to overseeing the competitive bidding

1    undertaken by the Government Entity for those Municipal Derivatives sold through ostensibly

2    competitive means. Derivatives Brokers enjoy mutually symbiotic and incestuous relationships

3    with large investment banks and insurance companies, and act as "finders" of municipal securities

4    business for the securities dealers or investment banks that often pay kickbacks to the Municipal

5    Derivatives Brokers in the form of finders' fees and monthly retainers.

6            13.    <u>Municipal Derivatives Counterparty</u>: As used herein, the term "Municipal

7    Derivatives Counterparty" or "Counterparty" means a Municipal Derivatives Seller with whom a

8    Government Entity contracts for a transaction involving the purchase of one or more of the

9    Municipal Derivatives described herein.

10           14.    <u>Municipal Derivatives Seller</u>: As used herein, the term "Derivatives Seller"

11    means an entity offering to enter into a Municipal Derivative transaction with a Government

12    Entity pursuant to the Competitive Bidding Process or other competitive process.

13           15.    <u>Rate of Return</u>: As used herein, the term "Rate of Return" means the fixed

14    amount, typically expressed as a percentage of the underlying bond proceeds amount or as a

15    specific interest rate, offered by a potential Municipal Derivatives Seller and ultimately received

16    by a Government Entity after it enters into the GIC or similar Municipal Derivative transaction

17    with a Municipal Derivatives Counterparty. The Rate of Return is an element of the Competitive

18    Bidding Process where competition is intended to occur for the benefit of bond issues. It was a

19    focus of Defendants' illegal bid-rigging and customer allocation scheme alleged herein.

20                                    **PARTIES**

21                                    **Plaintiff**

22           16.    Plaintiff, the County of Alameda, California, is a municipal corporation

23    and a Government Entity. Alameda County purchased Municipal Derivatives, including from

24    one or more Derivatives Seller Defendants pursuant to a Competitive Bidding Process during the

25    Class Period. Alameda County purchased millions of dollars' worth of Municipal Derivatives

26    from one or more of the Derivatives Seller Defendants undertaken to purchase the Municipal

27    Derivatives. As a result of the unlawful conspiracy alleged herein, Alameda County was injured

28    in its business or property. Alameda County has contracted for its GICs and swaps and other

1  Municipal Derivatives with a variety of brokers and underwriters, including defendants AIG,

2  Bank of America, and Bear Stearns, on which the Department of Justice has served subpoenas, or

3  informed their officers and employees they are targets of the investigation, as part of its

4  investigation into Municipal Derivative bid-rigging. Alameda County and its constituent agencies

5  purchased GICs and other Municipal Derivatives in conjunction with debt financing of

6  redevelopment projects, juvenile justice facilities, and the reconstruction of the Oakland-Alameda

7  County Coliseum.

8  **Municipal Derivatives Seller Defendants**

9  17.    Defendant AIG Financial Products Corp. ("AIG Financial") is a Delaware

10  corporation maintaining its principal place of business in Wilton, Connecticut.  It is a wholly

11  owned subsidiary of AIG International Inc.  During the Class Period, AIG Financial issued and

12  sold Municipal Derivatives to Alameda County and/or members of the Class in the United States.

13  a.    AIG Financial is part of the Capital Markets arm of its parent

14  company AIG, and raises funds for AIG in part through investment in Municipal Derivatives.

15  b.    In November, 2006, AIG Financial received a subpoena from the

16  Antitrust Division of the United States Department of Justice in connection with its grand jury

17  investigation into anticompetitive conduct in the Municipal Derivatives business.

18  18.    Defendant AIG SunAmerica Life Assurance Co., ("AIG SunAmerica") is

19  an Arizona corporation maintaining its principal place of business in Los Angeles, California.

20  During the Class Period, AIG SunAmerica issued and sold Municipal Derivatives to Alameda

21  County and/or members of the Class in the United States.

22  a.    In November, 2006, AIG SunAmerica received a subpoena from

23  the Securities and Exchange Commission in connection with the SEC's investigation into

24  anticompetitive practices in the Municipal Derivatives industry.

25  19.    Defendant Bank of America Corporation ("BOA") is a Delaware

26  corporation with its principal place of business in Charlotte, North Carolina.  During the time

27  period covered by this complaint, Bank of America was headquartered in San Francisco,

28  California and conducted substantial business operations in this judicial district.  During the Class

1   Period, BOA issued and sold Municipal Derivatives to Alameda County and/or members of the

2   Class in the United States, either directly or through its wholly-owned subsidiary Defendant Bank

3   of America, N.A ("BANA").

4           20.     Defendant Bank of America, N.A. ("BANA"), a wholly-owned subsidiary

5   of Defendant BOA, is a Delaware corporation with its principal place of business in Charlotte,

6   North Carolina.  During the Class Period, BANA issued and sold Municipal Derivatives to

7   Alameda County and/or members of the Class in the United States.

8                   a.      In November, 2006, BOA received subpoenas from the Antitrust

9   Division of the United States Department of Justice and the Securities and Exchange Commission

10  in connection with those agencies' investigations into anticompetitive conduct in the Municipal

11  Derivatives business.

12                  b.      In February, 2007, BOA entered into a Corporate Conditional

13  Leniency agreement with the DOJ in connection with the antitrust investigation into

14  anticompetitive conduct in the Municipal Derivatives business, indicating that BOA had engaged

15  in potentially criminal anti-competitive conduct in relation to the Municipal Derivatives industry.

16  Such leniency agreements, which insulate the corporate applicant from criminal antitrust

17  prosecution as long as it cooperates, are only entered into after the cooperating company has

18  proactively offered the DOJ evidence of *per se* violations of the antitrust laws.  Such leniency

19  agreements only cover criminal antitrust violations, and do not insulate companies from criminal,

20  civil or administrative actions in other areas.

21                  c.      On February 4, 2008, Defendant BOA's subsidiary BANA received

22  a so-called Wells notice from the SEC, advising the company that the SEC staff has

23  recommended that the SEC bring a civil or administrative action against BANA in connection

24  with its investigation of anticompetitive practices in the Municipal Derivatives industry.

25                  d.      BOA and BANA are also targets of investigation by the Internal

26  Revenue Service ("IRS") in connection with anticompetitive practices in the Municipal

27  Derivatives industry.  In February, 2007, concurrently with its entrance into the DOJ's Corporate

28  Leniency agreement covering criminal antitrust violations,  BOA entered into an agreement with

763663.1                              - 8 -                      CLASS ACTION COMPLAINT

1    the IRS related to BOA's role in providing GICs and other agreements in connection with certain

2    "blind pool" municipal bond transactions.

3                    e.      BOA has also been implicated in a bid-rigging and kickback

4    scheme involving a large GIC that BOA sold to the City of Atlanta in 2002 that also involved

5    Derivative Broker Defendants CDR and Winters & Co. as well as Derivative Seller Defendants

6    UBS and Piper Jaffray.

7            21.    Defendant Bear Stearns Companies, Inc. ("Bear Stearns") is a Delaware

8    corporation with its principal place of business in New York, New York.  During the Class

9    Period, Bear Stearns issued and sold Municipal Derivatives to Alameda County and/or members

10   of the Class in the United States.

11                   a.      The SEC has previously investigated Bearn Stearns' municipal

12   bond department and its municipal bond underwriting practices.

13                   b.      Stephen Salvadore, currently the Senior Managing Director and

14   Manager of Municipal Capital Markets Derivatives and Investments at Bear Stearns, has

15   disclosed that he is a target of the grand jury convened in the Southern District of New York by

16   the Antitrust Division of the Department of Justice investigating antitrust and other violations

17   related to anticompetitive conduct in the Municipal Derivatives business. Target letters of the

18   kind received by Salvadore are an indication that the DOJ has substantial evidence of the

19   commission of a federal crime and typically a sign that the recipient will soon be indicted absent a

20   plea agreement or cooperation deal.

21                   c.      In addition, at least one former Bear Stearns employee is a target of

22   both the SEC and the grand jury convened in the Southern District of New York by the Antitrust

23   Division of the Department of Justice investigating antitrust and other violations related to

24   anticompetitive conduct in the Municipal Derivatives business.

25                   d.      Patrick Marsh, who worked at Bear Stearns from 2000 to 2005 and

26   whose last position at the company was Managing Director and Chief of Municipal Structuring,

27   has disclosed that he was the recipient of a Wells notice from the SEC recommending civil or

28   administrative action against him in connection with securities violations related to bidding

763663.1                                    - 9 -                          CLASS ACTION COMPLAINT

1  procedures in the Municipal Derivatives industry during his tenure at Bear Stearns. Marsh also

2  disclosed that he is a target of the grand jury convened in the Southern District of New York by

3  the Antitrust Division of the Department of Justice investigating antitrust and other violations

4  related to anticompetitive conduct in the Municipal Derivatives business. Target letters of the

5  kind received by Marsh are an indication that the DOJ has substantial evidence of the commission

6  of a federal crime and typically a sign that the recipient will soon be indicted absent a plea

7  agreement or cooperation deal. Marsh was also subpoenaed by the SEC in connection with its

8  investigation into wrongdoing associated with municipal bond derivatives transactions in

9  Jefferson County, Alabama.

10     22.    Defendant Financial Guaranty Insurance Co. ("FGIC") is a Delaware

11  corporation maintaining its principal place of business in New York, New York. During the

12  Class Period, FGIC, a former affiliate of General Electric, issued and sold Municipal Derivatives

13  to Alameda County and/or members of the Class in the United States.

14     a.    FGIC has received a subpoena from the Securities and Exchange

15  Commission in connection with the SEC's investigation into anticompetitive practices in the

16  Municipal Derivatives industry.

17     23.    Defendant Financial Security Assurance Holdings, Ltd. ("FSA Holdings")

18  is a New York corporation maintaining its principal place of business in New York, New York.

19  During the Class Period, FSA Holdings issued and sold Municipal Derivatives to Alameda

20  County and/or members of the Class in the United States, either directly or through its wholly-

21  owned subsidiary FSA Capital Management Services, LLC, ("FSA Capital"), a Delaware limited

22  liability company headquartered in New York City.

23     a.    In November, 2006 FSA Holdings received subpoenas from the

24  Antitrust Division of the United States Department of Justice and the Securities and Exchange

25  Commission in connection with those agencies' investigations into anticompetitive conduct in the

26  Municipal Derivatives business.

27     b.    On February 4, 2008, FSA Holdings received a so-called Wells

28  notice from the Philadelphia regional office of the SEC, informing the company that the SEC

1   staff had recommended civil or administrative action against FSA Holdings in connection with its

2   investigation into anticompetitive practices in the Municipal Derivatives industry.  The Wells

3   notice issued to FSA Holdings related to alleged violations of Section 10(b) of the Securities

4   Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

5          24.     Defendant First Southwest Company ("First Southwest") is a Delaware

6   corporation with its principal place of business in Dallas, Texas.  During the Class Period, First

7   Southwest issued and sold Municipal Derivatives to Alameda County and/or members of the

8   Class in the United States.

9                  a.      First Southwest has received a subpoena from the Securities and

10  Exchange Commission in connection with the SEC's investigation into anticompetitive practices

11  in the Municipal Derivatives industry.

12         25.     Defendant Genworth Financial, Inc. ("Genworth") is a New York

13  corporation maintaining its principal place of business at Fairfield, Connecticut.  Genworth issued

14  and sold Municipal Derivatives to Alameda County and/or members of the Class in the United

15  States.

16         26.     Defendant Genworth Financial Investment Management, LLC ("GFIM"),

17  formerly known as Genworth Financial Asset Management, LLC, is a Virginia corporation

18  maintaining its principal place of business at Richmond, Virginia.  Genworth issued and sold

19  Municipal Derivatives to Alameda County and/or members of the Class in the United States.

20                 a.      GFIM received subpoenas from the Antitrust Division of the United

21  States Department of Justice and the Securities and Exchange Commission in connection with

22  those agencies' investigations into anticompetitive conduct in the Municipal Derivatives business.

23         27.     Defendant GE Funding Capital Market Services, Inc. ("GE Funding") is a

24  Delaware corporation maintaining its principal place of business in New York, New York.  GE

25  Funding is a member of the GE Funding Capital Market Services Group (GE Funding CMS).

26  During the Class Period, GE Funding issued and sold Municipal Derivatives to members of the

27  Class.

28

1    28.    Defendant JPMorgan Chase & Co. ("JPMorgan") is a Delaware

2    corporation maintaining its principal place of business in New York, New York.  During the

3    Class Period, JPMorgan issued and sold Municipal Derivatives to Alameda County and/or

4    members of the Class in the United States.

5    a.    In November, 2006, JPMorgan received subpoenas from the

6    Antitrust Division of the United States Department of Justice and the Securities and Exchange

7    Commission in connection with those agencies' investigations into anticompetitive conduct in the

8    Municipal Derivatives business.

9    b.    At least three former JPMorgan employees are targets of the Justice

10    Department's grand jury investigation into anticompetitive practices in the Municipal Derivatives

11    industry.

12    c.    Samuel Gruer, who worked at JPMorgan from 1994 through 2006

13    and whose last position was Vice-President in the Derivatives Marketing unit of the company's

14    Tax-Exempt Capital Markets Group, has disclosed that he is a target of the grand jury convened

15    in the Southern District of New York by the Antitrust Division of the Department of Justice

16    investigating antitrust and other violations related to anticompetitive conduct in the Municipal

17    Derivatives business.  Target letters of the kind received by Gruer are an indication that the DOJ

18    has substantial evidence of the commission of a federal crime and typically a sign that the

19    recipient will soon be indicted absent a plea agreement or cooperation deal.

20    d.    Shlomi Raz, who worked at JPMorgan from 1992 to 2003, has also

21    disclosed that he is a target of the grand jury convened in the Southern District of New York by

22    the Antitrust Division of the Department of Justice investigating antitrust and other violations

23    related to anticompetitive conduct in the Municipal Derivatives business.  Target letters of the

24    kind received by Raz are an indication that the DOJ has substantial evidence of the commission

25    of a federal crime and typically a sign that the recipient will soon be indicted absent a plea

26    agreement or cooperation deal.

27    e.    James Hertz, who worked at JPMorgan from 1994 until he was

28    fired from the firm in January, 2008, has also disclosed that JPMorgan informed him that he was

1      under investigation by the DOJ for what Hertz described as "conduct on the municipal derivatives

2      marketing desk," an indication that the investigation involves JPMorgan's entire municipal

3      derivatives business, which necessarily includes Municipal Derivatives. Target letters of the kind

4      received by Hertz are an indication that the DOJ has substantial evidence of the commission of a

5      federal crime and typically a sign that the recipient will soon be indicted absent a plea agreement

6      or cooperation deal.

7            29.      Defendant JPMorgan Chase Bank, N.A. ("JPMorgan N.A.") is a national

8      banking association with headquarters in Ohio, and is a subsidiary of JP Morgan Chase. During

9      the Class Period, JPMorgan N.A. issued and sold Municipal Derivatives to Alameda County

10      and/or members of the Class in the United States.

11           30.      Defendant Kinsell Newcomb & De Dios Inc. ("KND") is a California

12      corporation with its principal place of business in Solano Beach, California. During the Class

13      Period, KND issued and sold Municipal Derivatives to Alameda County and/or members of the

14      Class in the United States.

15                  a.      KND has received subpoenas from the Antitrust Division of the

16      United States Department of Justice and the Securities and Exchange Commission in connection

17      with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives

18      business.

19           31.      Defendant Lehman Brothers Inc. ("Lehman Brothers") is a Delaware

20      corporation maintaining its principal place of business in New York, New York. During the

21      Class Period, Lehman Brothers issued and sold Municipal Derivatives to members of the Class.

22      Lehman is a wholly-owned subsidiary of Lehman Brothers Holdings Inc.

23           32.      Defendant Merrill Lynch & Co. Inc. ("Merrill Lynch") is a Delaware

24      corporation maintaining its principal place of business in New York, New York. During the

25      Class Period, Merrill Lynch issued and sold Municipal Derivatives to members of the Class.

26           33.      Defendant Morgan Stanley ("Morgan Stanley") is a Delaware corporation

27      maintaining its principal place of business in New York, New York. During the Class Period,

28      Morgan Stanley issued and sold Municipal Derivatives to members of the Class.

1        34.      Defendant National Westminster Bank plc ("NatWest") is a public limited

2    corporation maintaining its principal place of business in London, England. During the Class

3    Period, NatWest issued and sold Municipal Derivatives to members of the Class. NatWest is a

4    subsidiary of Royal Bank of Scotland.

5        35.      Defendant Natixis, S.A. ("Natixis"), formerly known as IXIS Corporate &

6    Investment Bank and CDC Funding Corp., is a foreign corporation maintaining its principal place

7    of business in Paris, France. During the Class Period, Natixis issued and sold Municipal

8    Derivatives to Alameda County and/or members of the Class in the United States.

9                 a.      In November, 2006, Natixis' predecessor IXIS Corporate &

10   Investment Bank received a subpoena from the Antitrust Division of the United States

11   Department of Justice in connection with its grand jury investigation into anticompetitive conduct

12   in the Municipal Derivatives business.

13       36.      Defendant Piper Jaffray & Co. ("Piper Jaffray") is a Delaware corporation

14   with its principal place of business in Minneapolis, Minnesota. During the Class Period, Piper

15   Jaffray issued and sold Municipal Derivatives to Alameda County and/or members of the Class in

16   the United States.

17                a.      Piper Jaffray has received subpoenas from the Antitrust Division of

18   the United States Department of Justice and the Securities and Exchange Commission in

19   connection with those agencies' investigations into anticompetitive conduct in the Municipal

20   Derivatives business.

21                b.      James Towne, employed as Managing Director of Piper Jaffray's

22   municipal derivatives group until January, 2008, recently disclosed that Piper Jaffray informed

23   him that he is under investigation by the Antitrust Division of the Department of Justice for

24   potential antitrust and other violations relating to the Municipal Derivatives industry.

25       37.      Defendant Security Capital Assurance, Inc. ("Security Capital") is a

26   foreign corporation maintaining its principal place of business in Hamilton, Bermuda. During the

27   Class Period, Security Capital, either directly or through its affiliates Defendants XL Capital, Ltd.

28

763663.1                                    - 14 -                    CLASS ACTION COMPLAINT

1    and XL Asset Funding Company 1 LLC, issued and sold Municipal Derivatives to Alameda

2    County and/or members of the Class in the United States.

3         38.    Defendant Société Générale ("SocGen") is a French corporation

4    headquartered in Paris. During the Class Period, SocGen issued and sold Municipal Derivatives

5    to Alameda County and/or members of the Class in the United States, either directly or through

6    its wholly-owned subsidiaries Société Générale Americas, Inc., a Delaware corporation

7    headquartered in New York, New York and/or SG Americas Securities, LLC, a Delaware limited

8    liability corporation also headquartered in New York, New York.

9         a.    SocGen has received a subpoena from the Securities and Exchange

10   Commission in connection with the SEC's investigation into anticompetitive practices in the

11   Municipal Derivatives industry.

12        b.    SocGen's Municipal Derivatives business is being scrutinized by

13   the IRS, which is investigating improper kickbacks to Defendant CDR related to a GIC brokered

14   by CDR.

15        39.    Defendant Trinity Funding Company, LLC ("GE Trinity") is a New York

16   limited liability corporation maintaining its principal place of business in New York, New York.

17   GE Trinity is a member of the GE Funding Capital Market Services Group (GE Funding CMS).

18   During the Class Period, GE Trinity issued and sold Municipal Derivatives to members of the

19   Class.

20        40.    Defendant UBS AG ("UBS") is a Swiss corporation with its headquarters

21   in Basel, Switzerland. During the Class Period, UBS issued and sold Municipal Derivatives to

22   Alameda County and/or members of the Class in the United States, either directly or through its

23   wholly-owned subsidiary, Defendant UBS Securities, LLC ("UBS Securities").

24        a.    In November, 2006, UBS received subpoenas from the Antitrust

25   Division of the United States Department of Justice and the Securities and Exchange Commission

26   in connection with those agencies' investigations into anticompetitive conduct in the Municipal

27   Derivatives business.

28

763663.1                              - 15 -                    CLASS ACTION COMPLAINT

b.    On February 4, 2008, UBS received a so-called Wells notice from the Philadelphia regional office of the SEC advising the company that the SEC staff had recommended that the SEC bring a civil action against UBS in connection with the anticompetitive practices associated with municipal bond derivatives.

c.    Peter Ghavami, until December 2007 the Managing Director and Co-Manager of Municipal Derivatives at UBS Securities in New York and London, recently disclosed that he is a target of the grand jury convened in the Southern District of New York by the Antitrust Division of the Department of Justice investigating antitrust and other violations related to anticompetitive conduct in the Municipal Derivatives business. Target letters of the kind received by Ghavami are an indication that the DOJ has substantial evidence of the commission of a federal crime and typically a sign that the recipient will soon be indicted absent a plea agreement or cooperation deal.

41.    Defendant UBS Securities LLC, formerly known as UBS Warburg LLC, is a Delaware corporation with its principal place of business in New York, New York. It is a subsidiary of UBS AG. During the Class Period, UBS Securities issued and sold Municipal Derivatives to members of the Class.

42.    Defendant UBS Financial Services Inc. ("UBS Financial"), formerly known as PaineWebber Inc., is a Delaware corporation with its principal place of business in New York, New York. It is a subsidiary of UBS AG. In 2000, UBS Financial was purchased by Defendant UBS AG. During the Class Period, UBS Financial issued and sold Municipal Derivatives to members of the Class.

43.    Defendant Wachovia Bank, N.A. ("Wachovia N.A.") is a North Carolina corporation with its principal place of business in Charlotte, North Carolina. During the Class Period, Wachovia N.A. issued and sold Municipal Derivatives to Alameda County and/or members of the Class in the United States.

44.    Defendant Wachovia Corporation ("Wachovia") is a North Carolina corporation with its principal place of business in Charlotte, North Carolina. During the Class Period, Wachovia issued and sold Municipal Derivatives to Alameda County and/or members of

1    the Class in the United States either directly or through its wholly-owned subsidiary Defendant

2    Wachovia Bank, N.A. ("Wachovia N.A.").

3              a.       In November, 2006, Wachovia received subpoenas from the

4    Antitrust Division of the United States Department of Justice and the Securities and Exchange

5    Commission in connection with those agencies' investigations into anticompetitive conduct in the

6    Municipal Derivatives business.

7              b.       Both the DOJ and the SEC have advised Wachovia that they

8    believe Wachovia N.A. employees engaged in improper conduct in relation to competitively-bid

9    municipal derivatives transactions.

10             c.       Two Wachovia N.A. employees working in the company's

11   Derivatives Marketing Department, Martin McConnell (the Managing Director of Marketing) and

12   Paul Jay Saunders (the Director of Marketing), recently disclosed that they are targets of the

13   grand jury convened in the Southern District of New York by the Antitrust Division of the

14   Department of Justice investigating antitrust and other violations related to anticompetitive

15   conduct in the Municipal Derivatives business.  Target letters of the kind received by McConnell

16   and Saunders are an indication that the DOJ has substantial evidence of the commission of a

17   federal crime and typically a sign that the recipient will soon be indicted absent a plea agreement

18   or cooperation deal.  Wachovia placed both Saunders – who worked for Defendant Bank of

19   America from 1998 through 2003 – and McConnell on administrative leave following their

20   disclosure that they were targets of the government's grand jury investigation.

21             45.      Defendant XL Asset Funding 1, LLC ("XLAF") is a Delaware limited

22   liability corporation maintaining its principal place of business in Schaumberg, Illinois.  During

23   the Class Period, XLAF issued and sold Municipal Derivatives to Alameda County and/or

24   members of the Class in the United States.

25             a.       XLAF received subpoenas from the Antitrust Division of the

26   United States Department of Justice and the Securities and Exchange Commission in connection

27   with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives

28   business.

763663.1                          - 17 -                    CLASS ACTION COMPLAINT

| | |
|---|---|
| 1 | 46.    Defendant XL Life Insurance & Annuity Company ("XL Life Insurance") |
| 2 | is a subsidiary of XLAF maintaining its principal place of business in Schaumburg, Illinois. |
| 3 | During the Class Period, XL Life Insurance issued and sold Municipal Derivatives to Alameda |
| 4 | County and/or members of the Class. |
| 5 | 47.    Defendant XL Capital, Ltd. ("XL Capital") is a foreign corporation |
| 6 | maintaining its principal place of business in Hamilton, Bermuda.  During the Class Period, XL |
| 7 | Capital, either directly or through its affiliates Defendants Security Capital and XL Asset Funding |
| 8 | 1, LLC issued and sold Municipal Derivatives to Alameda County and/or members of the Class in |
| 9 | the United States. |

**Municipal Derivatives Broker Defendants**

| | |
|---|---|
| 11 | 48.    Defendant Cain Brothers & Company, LLC ("Cain") is a Delaware limited |
| 12 | liability corporation with its principal place of business in New York, New York.  During the |
| 13 | Class Period, Cain acted as a broker for members of the Class in purchasing Municipal |
| 14 | Derivatives from one or more of the Municipal Derivatives Seller Defendants. |
| 15 | a.    Cain was subpoenaed by the SEC in connection with its |
| 16 | investigation of anticompetitive practices in the Municipal Derivatives industry. |
| 17 | 49.    Defendant CDR Financial Products, Inc. ("CDR") is a Delaware |
| 18 | corporation maintaining its principal place of business at Beverly Hills, California.  During the |
| 19 | Class Period, CDR acted as a broker for members of the Class in purchasing Municipal |
| 20 | Derivatives from one or more of the Municipal Derivatives Seller Defendants. |
| 21 | a.    CDR's California offices were raided by the FBI in November, |
| 22 | 2006, at the start of the government's investigation into anticompetitive conduct in the Municipal |
| 23 | Derivatives market. |
| 24 | b.    CDR has been the subject of a series of long-standing federal |
| 25 | governmental investigations involving its dealings with other participants in the municipal |
| 26 | derivatives market, including Defendant Bank of America. |
| 27 | 50.    Defendant George K. Baum & Company ("Baum") is a Missouri |
| 28 | corporation with its principal place of business in Kansas City, Missouri.  During the Class |

1    Period, Baum acted as a broker for members of the Class in purchasing Municipal Derivatives

2    from one or more of the Municipal Derivatives Seller Defendants.

3                    a.      Baum was subpoenaed by the SEC in connection with its

4    investigation of anticompetitive practices in the Municipal Derivatives industry.

5                    b.      Baum has been the target of previous governmental investigations

6    related to its Municipal Derivatives business.

7                    c.      On November 10, 2006, Baum settled allegations with the IRS that

8    it diverted profits from municipal bond deals.  In one instance the IRS alleged that bidding was

9    rigged in the selection of a GIC provider for a $150 million loan pool underwritten by Baum in

10   1999 and issued by the Illinois Development Finance Authority.

11                51.    Defendant Investment Management Advisory Group, Inc. ("IMAGE") is a

12   Pennsylvania corporation maintaining its principal place of business at Pottstown, Pennsylvania.

13   During the Class Period, IMAGE acted as a broker for members of the Class in purchasing

14   Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

15                    a.      IMAGE's Pennsylvania offices were raided by the FBI in

16   November, 2006, at the start of the government's investigation into anticompetitive conduct in the

17   Municipal Derivatives market.

18                52.    Defendant Morgan Keegan & Co., Inc. ("Morgan Keegan"), a subsidiary of

19   Regions Financial Corp., is a Tennessee corporation maintaining its principal place of business in

20   Memphis, Tennessee.  During the Class Period, Morgan Keegan acted as a broker for members of

21   the Class in purchasing Municipal Derivatives from one or more of the Municipal Derivatives

22   Seller Defendants.

23                    a.      Morgan Keegan has received a subpoena from the Securities and

24   Exchange Commission in connection with the SEC's investigation into anticompetitive practices

25   in the Municipal Derivatives industry.

26                53.    Defendant PackerKiss Securities, Inc. ("PackerKiss") is a Florida

27   corporation maintaining its principal place of business in Delray Beach, Florida.  During the

28

1    Class Period, PackerKiss acted as a broker for members of the Class in purchasing Municipal

2    Derivatives from one or more of the Municipal Derivatives Seller Defendants.

3            54.    Defendant Shockley Financial Corp. ("Shockley"), a subsidiary of NelNet

4    Inc., is a corporation maintaining its principal place of business in Aurora, Colorado.  During the

5    Class Period, Shockley acted as a broker for members of the Class in purchasing Municipal

6    Derivatives from one or more of the Municipal Derivatives Seller Defendants.

7            55.    Defendant Sound Capital Management, Inc. ("Sound Capital") is a

8    Minnesota corporation maintaining its principal place of business at Eden Prairie, Minnesota.

9    During the Class Period, Sound Capital acted as a broker for members of the Class in purchasing

10   Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

11           a.    Sound Capital's Minnesota offices were raided by the FBI in

12   November, 2006, at the start of the government's investigation into anticompetitive conduct in the

13   Municipal Derivatives market.

14           56.    Defendant Winters & Co. Advisors, LLC ("Winters") is a California

15   limited liability company maintaining its principal place of business in Los Angeles, California.

16   During the Class Period, Winters acted as a broker for members of the Class in purchasing

17   Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

18                                    **CO-CONSPIRATORS**

19           57.    Various other persons, firms and corporations, not named as Defendants

20   herein, have participated as co-conspirators with Defendants and have performed acts and made

21   statements in furtherance of the conspiracy.

22           58.    Whenever in this Complaint reference is made to any act, deed or

23   transaction of any corporation, the allegation means that the corporation engaged in the act, deed

24   or transaction by or through its officers, directors, agents, employees or representatives while they

25   were actively engaged in the management, direction, control or transaction of the corporation's

26   business or affairs.

27

28

1        **CLASS ACTION ALLEGATIONS**

2        59.    Alameda County brings this action on behalf of itself and as a class action

3    under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on

4    behalf of all members of the following Class:

5              All state, local or municipal Government Entities and private
               entities in the United States and its territories that purchased
6              Municipal Derivatives directly from one or more of the Municipal
               Derivatives Seller Defendants and/or through one or more of the
7              Derivatives Broker Defendants at any time from January 1, 1992
               through December 31, 2007.  Excluded from the Class are all
8              federal governmental entities and instrumentalities of the federal
               government.
9

10       60.    Alameda County does not know the exact number of Class members

11   because such information is in the exclusive control of Defendants.  But due to the nature of the

12   trade and commerce involved, Alameda County believes that there are hundreds or thousands of

13   Class members as described above, the exact number and their identities being known by

14   Defendants.

15       61.    The Class is so numerous and geographically dispersed that joinder of all

16   members is impracticable.

17       62.    There are questions of law and fact common to the Class, including:

18              a.    Whether Defendants and their co-conspirators engaged in a

19   combination and conspiracy among themselves to fix, raise, maintain or stabilize the effective

20   prices of Municipal Derivatives sold in the United States;

21              b.    Whether Defendants and their co-conspirators engaged in a

22   combination and conspiracy among themselves to rig bids for Municipal Derivatives sold in the

23   United States;

24              c.    Whether Defendants and their co-conspirators engaged in a

25   combination and conspiracy among themselves to allocate customers and the markets for

26   Municipal Derivatives sold in the United States;

27              d.    The identity of the participants of the alleged conspiracy;

28

763663.1                          - 21 -                    CLASS ACTION COMPLAINT

1                    e.      The duration of the alleged conspiracy and the acts carried out by

2 Defendants and their co-conspirators in furtherance of the conspiracy;

3                    f.      Whether the alleged conspiracy violated Section 1 of the Sherman

4 Act, 15 U.S.C. § 1;

5                    g.      Whether the conduct of Defendants and their co-conspirators, as

6 alleged in this Complaint, violated the California Cartwright Act, Cal. Bus. & Prof. Code

7 § 16720, *et seq.*;

8                    h.      Whether the conduct of Defendants and their co-conspirators, as

9 alleged in this Complaint, violated the California Unfair Competition Law, Cal. Bus. & Prof.

10 Code § 17200, *et seq.*;

11                    i.      Whether the conduct of Defendants and their co-conspirators, as

12 alleged in this Complaint, caused injury to the business or property of Alameda County and the

13 other members of the Class;

14                    j.      The effect of the alleged conspiracy on the effective prices of

15 Municipal Derivatives sold in the United States during the Class Period;

16                    k.      Whether the Defendants and their co-conspirators fraudulently

17 concealed the conspiracy's existence from Alameda County and the other members of the Class;

18 and

19                    l.      The appropriate class-wide measure of damages.

20          63.      Alameda County is a member of the Class, Alameda County's claims are

21 typical of the claims of the Class members, and Alameda County will fairly and adequately

22 protect the interests of the Class. Alameda County is a direct purchaser of Municipal Derivatives,

23 and its interests are coincident with, and not antagonistic to, those of the other members of the

24 Class.

25          64.      Alameda County is represented by counsel who are competent and

26 experienced in the prosecution of antitrust and class action litigation.

27

28

763663.1                          - 22 -                        CLASS ACTION COMPLAINT

65.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

66.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

67.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable and is one for which records should exist.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  This class action presents no difficulties in management that would preclude maintenance as a class action.

## TRADE AND INTERSTATE COMMERCE

68.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

69.     During the Class Period, Defendants and their co-conspirators issued and sold substantial quantities of Municipal Derivatives, in a continuous and uninterrupted flow of interstate commerce to Government Entities located in states other than the states in which the Municipal Derivatives Seller Defendants issued and/or brokered these products.

70.     The conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on United States commerce.

## FACTS

### The Market for Municipal Derivatives

71.     Municipalities and state and local government agencies issue over $2 trillion worth of municipal bonds annually.

72.    While the tax-free bonds are sold in contemplation of construction, public housing or other public-works projects, municipalities have in the last decade opted to invest the proceeds of the bond sales before these projects are even started, or to hedge the interest-rate risk associated with the issuance of large amounts of tax-exempt debt.

73.    Municipal Derivatives have become an attractive investment vehicle for municipalities looking to park bond proceeds until the money raised from the sale is actually needed for capital projects, or to protect themselves from interest-rate risk associated with issuing their tax-exempt bonds. There are roughly $40 - $60 billion in Municipal Derivatives created in the United States annually.

74.    The market for Municipal Derivatives has become more concentrated since the late 1990's, with an increasingly smaller number of investment banks and bond insurers occupying the market.

75.    The Municipal Derivatives industry has been variously described by market participants as opaque, intertwined and interconnected, all characteristics which facilitate the type of illegal collusion alleged herein. The Municipal Derivatives market lacks transparency, and regulatory and private efforts to impose transparency have not been successful. On July 26, 2007, the Chairman of the Securities and Exchange Commission delivered a white paper to Congress calling for improved oversight of the municipal securities market.

### The Competitive Bidding Process

76.    A wide variety of Municipal Derivatives are sold through competitive bidding undertaken by Government Entities and overseen by the Municipal Derivatives Brokers acting as their fiduciaries.

77.    The Competitive Bidding Process involving GICs is illustrative of the way many Government Entities purchase Municipal Derivatives, and indicative of the methods by which the Defendants have succeeded in manipulating these financial instruments pursuant to their bid-rigging and customer allocation conspiracy.

78.    Flush with proceeds from a muni bond sale, a Government Entity looks to invest in a GIC. The Government Entity will retain a GIC Broker to facilitate the acquisition of

1   the contract.  The Government Entities typically pay a fee to the GIC Broker for shopping for
2   GIC Bids.

3          79.    In the wake of the so-called "yield-burning" scandal of the 1980's and
4   1990's – in which municipal bond issuers were sold overpriced investment vehicles or charged
5   fees that acted to artificially reduce the yields on their underlying bond issues – the IRS
6   promulgated regulations meant to ensure that Government Entities were purchasing Municipal
7   Derivatives at a fair market value price.

8          80.    IRS tax-exempt bond regulations (here, "Treasury Regulations") stipulate
9   that if Government Entities invest the proceeds of bond sales, the yield of the investment cannot
10   exceed the yield of the municipal bond itself.  Any interest exceeding the bond rate of the tax-
11   exempt bond investments is required to be rebated to the IRS, absent an exception.

12          81.    To satisfy these so-called arbitrage rules, any given GIC is structured to
13   limit the rate of interest that a municipality can earn on the GIC to less than the yield of the bond
14   whose issuance financed the investment in the GIC in the first place.  The Rate of Return any
15   particular Municipal Derivatives Seller can offer a Government Entity is therefore effectively
16   capped.

17          82.    Treasury Regulations related to Municipal Derivatives are aimed at
18   ensuring that Government Entities get competitive bids on the interest rate a Municipal
19   Derivatives Seller pays the municipalities under the terms of the GIC.  According to Treasury
20   Regulations, a GIC is sold at "fair market value" if the bidding process satisfies certain
21   procedures.  Essentially, there should be at least three reasonably competitive bids solicited from
22   Municipal Derivatives Sellers, and all of these bidders must have an equal opportunity to bid –
23   that is, no bidder can have a "last look" to review other bids before bidding on the contract.
24   Treasury Regulations state that a "reasonably competitive" Municipal Derivatives Seller is an
25   entity with "an established industry reputation" as a competitive Municipal Derivatives Seller.
26   The IRS may levy penalties under Section 6700 of the tax code when it determines bid-rigging
27   has occurred.

28

1   83. The Municipal Derivatives Broker, acting as the fiduciary to the

2 Government Entity, oversees the solicitation and placement of the bids from Municipal

3 Derivatives Sellers.

4   84. After hiring a Municipal Derivatives Broker to oversee the solicitation of

5 GIC Bids, Government Entities buy a GIC from a Municipal Derivatives Seller pursuant to the

6 Competitive Bidding Process.

7   85. The parties to a GIC are the Municipal Derivatives Seller, acting as the

8 Counterparty and the Government Entity. The Municipal Derivatives Seller now acting as the

9 Counterparty supplies the most salient term, namely the Rate of Return on the investment.

10   86. The GIC entitles the Government Entity to receive the return of the

11 Government Entity's initial principal plus guaranteed interest at a specified Rate of Return, and to

12 withdraw principal from the GIC as permitted.

13   87. Generally, a Government Entity will acquire a GIC in order to invest funds

14 on deposit in a debt service reserve fund or construction fund until it needs to use such funds to

15 service debt or fund the payment of project expenses in accordance with the underlying bond

16 documents.

17   88. In exchange for the payment of a guaranteed Rate of Return to the

18 Government Entity, and the full repayment of all principal on a date certain, the Municipal

19 Derivatives Counterparty is allowed to invest the principal furnished by the Government Entity.

20 The Municipal Derivatives Counterparty's profits are made on the spread between the Rate of

21 Return the Municipal Derivatives Counterparty offers to the Government Entity and the returns

22 the GIC's invested principal makes for the Municipal Derivatives Counterparty pursuant to

23 whatever investment the Municipal Derivatives Counterparty chooses.

24   89. The Competitive Bidding Process outlined in the Treasury Regulations

25 mandates that any Government Entity seeking to buy a GIC receive at least three bona fide Bids

26 from Municipal Derivatives Sellers. Each bidder typically faxes its Bid into the Municipal

27 Derivatives Broker, which collects the ostensibly competitive Bids and informs the Government

28

763663.1     - 26 -     CLASS ACTION COMPLAINT

1    Entity of the range of Bids, the identity of the Municipal Derivatives Sellers submitting them, and

2    the time each Bid was received.

3            90.    Each GIC Bid includes a statement that the Bid was determined without

4    regard to any other formal or informal agreement with another Municipal Derivatives Seller, and

5    that the Bid was not submitted solely as a so-called "courtesy" Bid.

6            91.    The Municipal Derivatives Seller that offers the highest-yielding Rate of

7    Return is selected as the Counterparty, often within hours of the close of the Competitive Bidding

8    Process.

9            92.    The vast majority of GICs purchased in the United States are purchased

10    pursuant to the competitive bidding process established by Treasury Regulation § 1.148-5 *et seq.*,

11    which has been in effect since approximately 1993, and which are only some of the Treasury

12    Regulations governing the reinvestment of municipal bond proceeds.

13            93.    The entire GIC bidding and purchasing process, as well as those processes

14    relating to the purchase of other types of Municipal Derivatives, is susceptible to abuse even

15    when dealings involve sophisticated and experienced Government Entities.

16            94.    Even sophisticated Government Entities (who rely in large part on the

17    Municipal Derivatives Broker Defendants acting as their fiduciaries) may not know that they are

18    the target of the bid-rigging and customer allocation conspiracy alleged herein.

19                                **The Bid-Rigging Conspiracy**

20            95.    The potential for bid-rigging in any given GIC transaction exists in the

21    exploitation of the Rate of Return that a particular GIC Seller is willing to offer to a Government

22    Entity looking to invest its bond proceeds.  The Municipal Derivatives Seller Defendants, aided

23    by the Municipal Derivatives Broker Defendants, have turned the Treasury Regulations into a

24    travesty by exploiting Government Entities' need for reinvestment of bond proceeds.

25            96.    The Municipal Derivatives Seller Defendants, in concert with the

26    Municipal Derivative Brokers, similarly exploited the elements of other types of Municipal

27    Derivatives bought by Government Entities as part of their bid-rigging and customer allocation

28    conspiracy.

763663.1                                - 27 -                    CLASS ACTION COMPLAINT

97.    Bid-rigging of GIC transactions, which are illustrative of anticompetitive conduct in the overall market for Municipal Derivatives, typically occurs when only one firm submits a reasonable, financially viable Bid, and the other two or more bidders submit Bids offering unjustifiably low Rates of Return, or simply refuse (or "pass") on the opportunity to bid.

98.    Other times, bids are late or incomplete, leaving only one viable bid for the Government Entity to choose from.

99.    Although at least one market participant has attempted to add transparency to the market by developing a web-based bid auction service, GIC Bids are traditionally done over the phone or sent to Municipal Derivatives Brokers via fax, facilitating collusion of the type alleged herein.

100.    At least one investment bank has provided the government with transcripts of telephone conversations that indicated that the investment bank and other market participants were involved in anticompetitive conduct on Municipal Derivatives sold to Government Entities.

101.    While the winning bid may be financially viable in light of the Treasury Regulations' restrictions on bond issue reinvestment, it is not necessarily at fair market value, and does not necessarily provide the Government Entity with the best possible Rate of Return on the investment it is seeking by buying the GIC.

102.    The unrealistically low bids – dubbed "courtesy bids" because they are provided solely as a courtesy so that another Municipal Derivatives Seller can win on a bid that is below fair market value – are often more than 100 basis points below the winning bid. As Mark Scott, director of the IRS tax exempt bond office, stated in *The Bond Buyer* on January 6, 2005, "When a bid is 100 to 150 basis points below the market and there is no justification for that being so low, one of the assumption you can draw is that there are courtesy bids being provided."

103.    Often the winning bid is the only one high enough to make the GIC work and be a worthwhile reinvestment vehicle for the Government Entity.

104.    According to a speaker at a teleconference organized by the National Association of Bond Lawyers and reported in *The Bond Buyer* on February 8, 2007, the use of courtesy bids in GICs transactions is quite prevalent. IRS officials have stated that bid-rigging is

1    a wide and pervasive practice in GIC transactions and have uncovered numerous transactions

2    involving rigged bids and customer allocation. A number of these transactions involve both the

3    Municipal Derivatives Seller Defendants and the Municipal Derivatives Broker Defendants.

4                105.    Municipal Derivatives Brokers also routinely offer favored Municipal

5    Derivatives Sellers with an illegal "last look" at their competitors' submitted bids, or even

6    exclude potential bidders without the Government Entity's knowledge.

7                106.    Evidence seized by the federal government as part of its wide-ranging

8    investigation, including taped telephone conversations, revealed instances in which the winning

9    bidder was given a "last look" at other bids, or bidders were asked to bid low in exchange for

10   preferential treatment in later deals.

11               107.    As part of its ongoing investigation into these practices, the IRS also

12   uncovered several bidding schemes that allowed the Municipal Derivatives Seller to underpay for

13   the GIC – that is, provide a less than fair market value interest rate – and then overpay the

14   Municipal Derivatives Broker for other investment agreements or remarketing fees associated

15   with the GIC, a form of kickback that may jeopardize the tax-exempt status of the underlying

16   bond or result in excess "arbitrage" paid to the federal government.

17                        **Governmental Investigations of Defendants' Conspiracy**

18               108.    On Wednesday, November 15, 2006, the FBI began a series of nationwide

19   raids on numerous Municipal Derivatives Brokers, including the Municipal Derivatives Broker

20   Defendants. The FBI raids coincided with the service of nearly two dozen subpoenas on other

21   participants in the Municipal Derivatives business, including the Municipal Derivatives Sellers

22   named as Defendants herein.

23               109.    The DOJ's Antitrust Division served subpoenas from a grand jury sitting in

24   the Southern District of New York, and a number of the targeted companies revealed that they

25   had also received subpoenas from the Securities and Exchange Commission in connection with a

26   parallel civil probe.

27               110.    The Antitrust Division is conducting a criminal probe into anticompetitive

28   conduct, including bid-rigging and customer allocation, and the DOJ is contemplating charging

1   market participants with continuing acts of conspiracy, and (as detailed above) have targeted a

2   number of individuals for indictment.

3           111.    The SEC probe, entitled *In the Matter of Certain GIC Brokers*, is focused

4   on securities fraud in municipal bond deals undertaken since 2000. Upon information and belief,

5   the SEC is investigating Municipal Derivatives Sellers' non-disclosure of an extensive scheme

6   involving kickbacks to Municipal Derivatives Brokers, a scheme that acted as a necessary

7   corollary to the conspiracy alleged herein. Such non-disclosure of kickbacks to Municipal

8   Derivatives Brokers jeopardizes the tax-exempt status of Government Entities' bonds, or may

9   subject them to potentially excessive arbitrage payments to the federal government.

10          112.    The DOJ and SEC investigations follow a lengthy and continuing probe by

11  the IRS' Criminal Investigation Division and its Tax-Exempt Bond office.

12          113.    The Justice Department subpoenas asked for documents, e-mails, tapes or

13  notes of phone conversations and other information regarding "contracts involving the investment

14  or reinvestment of the proceeds of tax-exempt bond issues and qualified zone academy bonds [as

15  well as] related transactions involving the management or transferal of the interest rate risk

16  associated with those bonds, including but not limited to [GICs], forward supply, purchase or

17  delivery agreements; repurchase agreements; swaps; options; and swaptions."

18          114.    The subpoenas also demanded organizational charts, phone directories, and

19  lists of all employees involved with Municipal Derivatives, in addition to all documents

20  associated with what the subpoenas apparently described as "relevant municipal contracts

21  awarded or intended to be awarded pursuant to competitive bidding," which would include

22  invitations to bid; solicitations, notices or RFPs issued to any provider by municipal clients;

23  actual or proposed responses to those RFPs; and amounts and prices bid for the various

24  investment vehicles.

25          115.    On February 9, 2007, Defendant Bank of America announced that it

26  entered into a leniency agreement with the Justice Department in connection with what it

27  described as "the Department's investigation into anticompetitive practices in the municipal

28  derivatives industry."

1       116.   Defendant Bank of America noted that the amnesty grant "was the result of

2  the company voluntarily providing information to the Department before the Department began

3  its investigation, as well as the company's continuing cooperation."

4       117.   Entry into the DOJ's amnesty program follows presentation of evidence of

5  a *per se* antitrust violation on behalf of the applicant, in this instance Defendant Bank of America.

6  Evidence of Defendant Bank of America's dealings, including recorded telephone conversations

7  of traders giving courtesy bids, was one of the key galvanizers of the criminal investigation.  Key

8  derivatives officials at the bank were placed on "administrative leave," including Dean Pinard, the

9  head of BOA's derivatives department.

10       118.   Defendant Bank of America also disclosed that it had reached a

11  $14.7 million settlement with the IRS relating to the company's role in providing GICs and other

12  agreements to municipal bond issuers.

13       119.   As detailed in Paragraphs 16 to 53 above, a number of individuals have

14  been targeted for indictment by the Department of Justice, and a number of Municipal Derivatives

15  Seller Defendants are facing civil and administrative actions from the SEC in relation to that

16  agency's investigation into anticompetitive practices in the Municipal Derivatives market.

17                       **FRAUDULENT CONCEALMENT**

18       120.   Alameda County and members of the Class had no knowledge of the

19  agreement, contract, combination, and conspiracy alleged in this Complaint, or of any facts that

20  might have led to the discovery thereof, until shortly before the filing of this action.  Alameda

21  County could not have discovered the agreement, contract, combination, and conspiracy at an

22  earlier date by the exercise of reasonable diligence because of the deceptive practices and

23  methods of secrecy employed by Defendants and their co-conspirators to avoid detection of, and

24  fraudulently conceal, their agreement, contract, combination, and conspiracy.  These methods of

25  secrecy included, but were not limited to, secret meetings, misrepresentations concerning the

26  reasons for price increases, encouraging witnesses to give false testimony to the grand jury and

27  government officials, and destroying or concealing evidence of their illegal conduct.

28

1      121.    The affirmative acts of the Defendants alleged herein, including acts in

2   furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that

3   precluded detection.

4      122.    By their very nature, Defendants' bid-rigging and customer-allocation

5   conspiracy was inherently self-concealing. The Municipal Derivatives industry is not exempt

6   from antitrust regulation, and thus Alameda County reasonably considered it to be a well-

7   regulated competitive industry.

8      123.    In the context of the circumstances surrounding Defendants' pricing

9   practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a

10   reasonable person that defendants' bidding and pricing were conspiratorial. Accordingly, a

11   reasonable person under the circumstances would not have been alerted to investigate the

12   legitimacy of Defendants' proffered Municipal Derivatives prices.

13      124.    Alameda County and members of the Class could not have discovered the

14   alleged contract, conspiracy, or combination at an earlier date by the exercise of reasonable

15   diligence because of the deceptive practices and techniques of secrecy employed by Defendants

16   and their co-conspirators to avoid detection of, and fraudulently conceal, their contract,

17   combination or conspiracy. Such practices are especially prevalent in bid-rigging and customer-

18   allocation conspiracies such as the one alleged herein.

19      125.    Because the alleged conspiracy was both self-concealing and affirmatively

20   concealed by Defendants and their co-conspirators, Alameda County and members of the Class

21   had no knowledge of the alleged conspiracy, or of any facts or information that would have

22   caused a reasonably diligent person to investigate whether a conspiracy existed.

23      126.    As a result of Defendants' fraudulent concealment of their conspiracy, the

24   running of any statute of limitations has been tolled with respect to any claims that Alameda

25   County and members of the Class have alleged in this Complaint.

26      127.    Throughout the Class Period, Defendants and their co-conspirators

27   affirmatively and fraudulently concealed their unlawful conduct.

28

1        128.    Alameda County and the Class members did not discover, nor could have

2    discovered through reasonable diligence, that Defendants and their co-conspirators were violating

3    the antitrust laws until before this litigation was commenced because Defendants and their co-

4    conspirators used and continue to use deceptive and secret methods to avoid detection and to

5    affirmatively conceal their violations.  Nor could Alameda County or the Class members have

6    discovered the violations earlier than that time because Defendants and their co-conspirators

7    conducted their conspiracy secretly, concealed the nature of their unlawful conduct and acts in

8    furtherance thereof, and fraudulently concealed their activities through various other means and

9    methods designed to avoid detection.

10        129.    Defendants and their co-conspirators engaged in a successful

11    anticompetitive conspiracy concerning Municipal Derivatives, which they affirmatively

12    concealed, at least in the following respects:

13            a.    By meeting secretly to discuss effective prices, bids, and customers

14    and markets of Municipal Derivatives in the U.S.;

15            b.    By agreeing among themselves not to discuss publicly, or otherwise

16    reveal, the nature and substance of the acts and communications in furtherance of their illegal

17    scheme;

18            c.    By intentionally creating the false appearance of competition by

19    staging sham auctions in which the results were pre-determined; and

20            d.    By furnishing each other participant in all given bidding sessions

21    with illegal "last looks" at their ostensible competitors' bids.

22        130.    Alameda County and Class members did not know, and could not have

23    discovered through reasonable diligence, that the auctions arranged by the Derivatives Broker

24    Defendants were sham, and that rather than being competitive, the results of the auctions were

25    rigged.

26        131.    As a result of Defendants' fraudulent concealment, all applicable statutes

27    of limitations affecting Alameda County's and the Class' claims have been tolled.

28

763663.1                        - 33 -                    CLASS ACTION COMPLAINT

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### (Violation of Section 1 of the Sherman Act)

132.    From as early as January 1, 1992 through the present, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Municipal Derivatives in the United States in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

133.    The contract, combination or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize or maintain at artificially supracompetitive prices for Municipal Derivatives and to rig bids and to allocate customers and markets for Municipal Derivatives in the United States.

134.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including:

a.    participating in meetings and conversations among themselves during which they agreed to price Municipal Derivatives at certain levels, and otherwise to fix, increase, maintain or stabilize effective prices paid by Alameda County and members of the Class with respect to Municipal Derivatives sold in the United States and to rig bids and allocate customers and markets of Municipal Derivatives;

b.    arranging sham auctions among the Municipal Derivatives Seller Defendants that were designed to create the appearance of competition for the sale of Municipal Derivatives, but in which the result had been agreed upon among the Defendants and co-conspirators;

c.    allocating customers and markets for Municipal Derivatives in the United States in furtherance of their agreements;

d.    rigging bids for Municipal Derivatives sold in the United States; and

e.    participating in meetings and conversations among themselves to implement, adhere and police the agreements they reached.

1    135.    Defendants and their co-conspirators engaged in the actions described

2    above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease or

3    stabilize prices and to allocate customers and markets with respect to Municipal Derivatives.

4    136.    The Defendants' unlawful contract, combination or conspiracy has had at

5    least the following effects:

6    a.    Effective prices paid by Alameda County and the members of the

7    Class with respect to Municipal Derivatives were fixed, stabilized and maintained at artificially

8    low and non-competitive levels in the United States;

9    b.    Bids for Municipal Derivatives sold in the United States were

10   rigged;

11   c.    Customers and markets for Municipal Derivatives were allocated

12   among Defendants and their co-conspirators;

13   d.    Alameda County and the other members of the Class paid more or

14   received lower Rates of Return for the Municipal Derivatives they purchased than they would

15   have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators'

16   collusive and unlawful activities;

17   e.    Price competition with respect to the sale of Municipal Derivatives

18   was restrained, suppressed and eliminated in the United States; and

19   f.    As a direct and proximate result of the illegal combination, contract

20   or conspiracy, Alameda County and the members of the Class have been injured and financially

21   damaged in their businesses and property, in amounts to be determined, by being deprived of the

22   highest-allowable interest rate on its Municipal Derivatives investment.  The courtesy (sometimes

23   also called complimentary) bids submitted by the Municipal Derivatives Sellers defrauded the

24   Government Entities by creating the appearance of competition to conceal the secretly deflated

25   interest rate offers.

26

27

28

**SECOND CLAIM FOR RELIEF**
**(Violation of the California Cartwright Act,**
**Cal. Bus. & Prof. Code section 16720, *et seq.*)**

137.  Alameda County, on behalf of itself and all others similarly situated,

realleges and incorporates, as if fully alleged herein, each of the allegations contained in the

preceding paragraphs of this Complaint, and further alleges against Defendants as follows.

138.  The unlawful conduct of Defendants, including the Defendants

headquartered or based in California, was centered in and carried out within California, and

Defendants' conduct within California injured all members of the Class throughout the United

States. Therefore, this claim for relief under California law is brought on behalf of all members

of the Class, whether or not they are California residents.

139.  Beginning at least as early as January 1, 1992 through the present, the exact

dates being unknown to Alameda County, Defendants and various co-conspirators entered into

and engaged in a continuing unlawful trust in restraint of the trade and commerce described above

in violation of Section 16720, California Business and Professional Code. Defendants, and each

of them, have acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of,

allocate markets and rig bids for, Municipal Derivatives.

140.  For the purpose of forming and implementing the alleged combinations,

trusts, agreements, understandings and concert of action, Defendants and their co-conspirators did

those things they conspired to do, including but not limited to the acts alleged above, including

actions:

a.  to fix, raise, maintain and stabilize the price of Municipal

Derivatives;

b.  to allocate markets for Municipal Derivatives amongst themselves;

and

c.  to submit rigged bids for Municipal Derivatives.

141.  In formulating and carrying out the alleged combinations, trusts,

agreements, understandings and concert of action, Defendants and their co-conspirators engaged

in anticompetitive activities, the purpose and effect of which were (a) to artificially raise, fix,

763663.1                                    - 36 -                        CLASS ACTION COMPLAINT

1    maintain, or stabilize the prices of Municipal Derivatives; (b) to allocate among themselves

2    Municipal Derivatives markets and customers; and (c) to facilitate, effectuate, and implement the

3    contract, combination, and conspiracy.

4          142.    The combination and conspiracy alleged herein has had the following

5    effects, among others:

6               a.    Price competition in the sale of Municipal Derivatives has been

7    restrained, suppressed and/or eliminated in the State of California and throughout the United

8    States;

9               b.    Prices for Municipal Derivatives sold by Defendants and their

10   co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-

11   competitive levels in the State of California and throughout the United States; and

12              c.    Those who purchased Municipal Derivatives from Defendants and

13   their co-conspirators have been deprived of the benefit of free and open competition.

14         143.    As a direct and proximate result of the illegal combination, trust,

15   agreement, understanding and concert of action, Alameda County and the members of the Class

16   have been injured in their business and property in that they paid more for Municipal Derivatives

17   than they otherwise would have paid in the absence of Defendants' unlawful conduct.

18         144.    As a result of Defendants' violation of Section 16720 of the California

19   Business and Professions Code, Alameda County seeks treble damages and the costs of suit,

20   including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and

21   Professions Code.

22                                     **THIRD CLAIM FOR RELIEF**

              **(Violation of the California Unfair Competition Law,**

23                 **Cal. Bus. & Prof. Code section 17200, *et seq*.)**

24         145.    Alameda County, on behalf of itself and all others similarly situated,

25   realleges and incorporates, as if fully alleged herein, each of the allegations contained in the

26   preceding paragraphs of this Complaint, and further alleges against Defendants as follows.

27         146.    Defendants' unlawful conduct was centered in, carried out and perfected

28   mainly within the State of California, and Defendants' conduct within California injured all

763663.1                           - 37 -                    CLASS ACTION COMPLAINT

1    members of the Class throughout the United States. Therefore, this claim for relief under

2    California law is brought on behalf of all members of the Class, whether or not they are

3    California residents.

4         147.    Beginning at least as early as January 1, 1992 and continuing to the

5    present, the exact dates being unknown to Alameda County, Defendants committed acts of unfair

6    competition, as defined by Sections 17200, *et seq.* of the California Business and Professions

7    Code, commonly known as the Unfair Competition Law, by engaging in the acts and practices

8    specified above.

9         148.    Alameda County and the members of the Class bring this claim pursuant to

10   Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution

11   and/or disgorgement from these Defendants for acts, as alleged herein, that violate the Unfair

12   Competition Law.

13        149.    Defendants' acts, omissions, misrepresentations, practices and non-

14   disclosures, as alleged herein, constitute a common course of conduct of unfair competition by

15   means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of

16   California Business and Professions Code, Section 17200, *et seq.*, in that, for example:

17               a.    the violations of Section 16720, *et seq.*, of the California Business

18   and Professions Code, set forth above;

19               b.    the acts described above violate the Sherman Act, 15 U.S.C. § 1;

20               c.    Defendants' acts, omissions, misrepresentations, practices and

21   nondisclosures, as described above, whether or not in violation of Section 16720, *et seq.* of the

22   California Business and Professions Code, and whether or not concerted or independent acts, are

23   otherwise unfair, unconscionable, unlawful or fraudulent;

24               d.    Defendants' acts and practices are unfair to consumers of Municipal

25   Derivatives in the State of California and throughout the United States, within the meaning of

26   Section 17200, California Business and Professions Code; and

27               e.    Defendants' acts and practices are fraudulent or deceptive within

28   the meaning of Section 17200 of the California Business and Professions Code.

763663.1                              - 38 -                    CLASS ACTION COMPLAINT

1          150.    Alameda County and each of the Class members are entitled to full

2   restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits

3   which may have been obtained by Defendants as a result of such business acts or practices.

4          151.    The unlawful and unfair business practices of Defendants, and each of

5   them, as described above, have caused Alameda County and the members of the Class to pay

6   supra-competitive and artificially-inflated prices for Municipal Derivatives.  Alameda County and

7   the members of the class suffered injury in fact and lost money or property as a result of such

8   unfair competition.

9          152.    The conduct of Defendants as alleged in this Complaint violates

10  Section 17200 of the California Business and Professions Code.

11         153.    As alleged in this Complaint, Defendants and their co-conspirators have

12  been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair

13  competition. Alameda County and the members of the Class are accordingly entitled to equitable

14  relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation

15  and benefits which may have been obtained by Defendants as a result of such business practices,

16  pursuant to the California Business and Professions Code, Sections 17203 and 17204.

17                            **PRAYER FOR RELIEF**

18         WHEREFORE, the Plaintiff prays for relief as follows:

19         1.     That the Court determine that this action may be maintained as a class

20  action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Alameda

21  County be certified as a class representative and Alameda County's counsel be appointed as

22  counsel for the Class;

23         2.     That the unlawful contract, combination or conspiracy alleged be adjudged

24  and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the

25  Sherman Act and Section 16720, *et seq.*, of the California Business & Professions Code (the

26  Cartwright Act);

27

28

763663.1                          - 39 -                    CLASS ACTION COMPLAINT

1          3.      That the unlawful contract, combination or conspiracy alleged be adjudged

2    and decreed to be unfair, fraudulent, and illegal in violation of Section 17200, *et seq.*, of the

3    California Business & Professions Code (the Unfair Competition Law);

4          4.      That Alameda County and the Class recover damages and restitution, as

5    provided by law, determined to have been sustained as to each of them, in an amount to be trebled

6    in accordance with the antitrust laws, and that judgment be entered against defendants on behalf

7    of Alameda County and of the Class;

8          5.      That Alameda County and the Class recover their costs of the suit,

9    including attorneys' fees, as provided by law; and

10          6.      For such other and further relief as is just under the circumstances.

11

12                              **DEMAND FOR JURY TRIAL**

13          Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands

14    a jury trial as to all issues triable by a jury

15

16    Dated: July 8, 2008              By: _____
                                              Richard E. Winnie
17

18                                      Richard E. Winnie (SBN 68048)
                                        County Counsel
19                                      *richard.winnie @acgov.org*
                                        Brian E. Washington (SBN 146807)
20                                      Assistant County Counsel
                                        *brian.washington@acgov.org*
21                                      Claude F. Kolm (SBN 83517)
                                        Deputy County Counsel
22                                      *claude.kolm@acgov.org*
                                        COUNTY OF ALAMEDA, CALIFORNIA
23                                      1221 Oak Street, Suite 463
                                        Oakland, CA 94612
                                        Telephone:    (510) 272-6700
24                                      Facsimile:    (510) 272-5020

25

26

27

28

763663.1                              - 40 -                    CLASS ACTION COMPLAINT

1                               Richard M. Heimann (SBN 63607)
                               *rheimann@lchb.com*

2                               Joseph R. Saveri (SBN 130064)
                               *jsaveri@lchb.com*

3                               Eric B. Fastiff (SBN 182260)
                               *efastiff@lchb.com*

4                               Jordan Elias (SBN 228731)
                               *jelias@lchb.com*

5                               LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                               275 Battery Street, 30th Floor

6                               San Francisco, CA 94111
                               Telephone:   (415) 956-1000

7                               Facsimile:    (415) 956-1008

8                               James A. Quadra (SBN 131084)
                               *quadra@meqlaw.com*

9                               Sylvia Sokol (SBN 200126)
                               *sokol@meqlaw.com*

10                             MOSCONE, EMBLIDGE & QUADRA, LLP
                               220 Montgomery Street

11                             Mills Tower, Suite 2100
                             San Francisco, CA 94104

12                             Telephone:   (415) 362-3599
                             Facsimile:    (415) 362-2006

13                             Steven E. Fineman (SBN 140335)

14                             *sfineman@lchb.com*
                             Daniel E. Seltz

15                             *dseltz@lchb.com*
                             Michael J. Miarmi

16                             *mmiarmi@lchb.com*
                             LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

17                             780 Third Avenue, 48th Floor
                             New York, NY 10017

18                             Telephone:   (212) 355-9500
                             Facsimile:    (212) 355-9592

19

20                             *Attorneys for Individual and Representative Plaintiff*
                             *County of Alameda, California*

21

22

23

24

25

26

27

28

763663.1                              - 41 -                     CLASS ACTION COMPLAINT